SAN FRANCISCO BAYKEEPER, a project of Waterkeepers Northern California; and Center for Marine Conservation, Plaintiffs,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, a federal agency; United States Fish & Wildlife Service, a federal agency; and National Marine Fisheries Service, a federal agency, Defendants.

No. C 01–0602 CW.

United States District Court, N.D. California.

Aug. 12, 2002.

Deborah A. Sivas, Michael R. Lozeau, Earth Justice Legal Defense Fund, Stanford, CA, for San Francisco Baykeeper, a project of waterkeepers Northern California, Center for Marine Conservation.

Charles M. O'Connor, U.S. Attorney's Office, Environment & Natural Resources Unit, San Francisco, CA, Seth M. Barsky, Wildlife and Marine Resources Section, John C. Cruden, S. Jay Govindan, USDJ–Environmental & Natural, Resources Division, Wildlife & Marine Resources Section, Washington, DC, for U.S. Army Corps of Engineers, U.S. Fish and Wildlife Service, National Marine Fisheries Service.

ORDER DENYING PLAINTIFFS' MO-
TION FOR SUMMARY JUDG-
MENT; GRANTING DEFEN-
DANTS' CROSS MOTION FOR
SUMMARY JUDGMENT

WILKEN, District Judge.

The case involves the environmental impact of two construction projects initiated by the Port of Oakland (Port). The first project, the Oakland Harbor Navigation Improvement Project (dredging project), is jointly funded by the Port and Defendant United States Army Corps of Engineers (Corps). It will deepen the channels and berths at the Port from forty-two feet to fifty feet. The second project, the berths project, will create four new container berths and two new cargo terminals at the Port. The berths project is dependant on receipt of a Corps permit to dredge and fill as necessary to create the new berths.

Because of the Corps' involvement in the projects, the consultation provisions of both the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, are implicated. Plaintiffs move for summary judgment that Defendant federal agencies violated both NEPA and the ESA by failing adequately to analyze and disclose the potential environmental consequences of the projects. Defendants oppose the motion and cross-move for summary judgment that their consultation and analysis satisfied their statutory obligations. The matter was heard on July 26, 2002. Having considered all of the papers filed, by the

parties and oral argument on the motion, the Court denies Plaintiffs' motion for summary judgment (Docket # 33) and grants Defendants' cross motion for summary judgment (Docket # 49).

## BACKGROUND

A. The Dredging Project and the Berths Project

The dredging project was initiated because the Port's forty-two foot shipping channels and berths are too shallow to allow the latest generation of large, "post-Panamax" container ships to enter and exit the Port.[1] Absent the dredging project, post-Panamax ships either would have to enter the Port "light loaded" (i.e. with reduced cargo so that they would ride high in the water) or await high tides to enter and exit the Port. Alternatively, carriers could send only older, Panamax class vessels to Oakland. In order to provide modern and efficient shipping channels that could accommodate newer vessels, the Port and the Corps proposed the dredging project, which will deepen the channels and berths to a fifty foot depth. The dredging project is funded by both the Port and the Corps.

The berths project is an independent undertaking of the Port to create four new berths, two new container terminals and a shoreline park. The Port initiated this project as "one component of the Port's ongoing efforts to modernize and develop its ship, rail, and truck cargo-handling facilities to meet the projected demand for transportation services ...." Corps AR 1727.[2] The Corps is not undertaking any

1. "Panamax" vessels are the older class of vessels whose width is constrained by the dimensions of the Panama Canal. Post–Panamax vessels are wider than those in the Panamax class.

2. There are three separate administrative records here under review. "Corps AR" refers to the record produced by the Army Corps of Engineers. "FWS AR" refers to the United States Fish and Wildlife Service administrative record. "NMFS AR" refers to the administrative record of the National Marine Fisheries Service. The Corps AR is the essential record for the purpose of determining if the agency action complied with NEPA. The FWS

of the work in conjunction with the berths project. Rather, the Corps' authority over this project is pursuant to section 404 of the Clean Water Act, 33 U.S.C. § 1344. Pursuant to this statute, the Port must receive a permit from the Corps for any dredging, filling and construction of facilities on submerged lands.

## B. Statutory and Regulatory Requirements

In its capacity as the action agency with respect to the dredging project and the regulating agency with respect to the berths project, the Corps was required to satisfy statutory and regulatory obligations under NEPA and to engage in consultation with Defendant Fish and Wildlife Service (FWS) and Defendant National Marine Fisheries Service (NMFS) pursuant to section 7 of the ESA.

### 1. NEPA

NEPA is the basic "national charter for protecting the environment." 40 C.F.R. § 1500.1(a). It requires all federal agencies to prepare an environmental impact statement (EIS) for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The responsible federal agency may first choose to prepare an environmental assessment (EA), a preliminary document which "briefly provides sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9. After considering the EA, the agency may then decide to issue either a finding of no significant impact (FONSI) or a more detailed EIS.

NEPA is procedural in nature. It does not require "that agencies achieve particular substantive environmental results." *Marsh v. Or. Natural Res. Council,* 490

U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Rather, it requires agencies to collect, analyze and disseminate information so that "the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Id.* Federal agencies comply with NEPA by carrying out this procedural mandate.

### 2. ESA

Section 7 of the ESA, 16 U.S.C. § 1536, requires every federal agency to ensure that any action that it funds, authorizes, or carries out is not likely to jeopardize the continued existence of any listed species or adversely modify the critical habitat of any such species. *See also* 50 C.F.R. § 402.01(a). FWS and NMFS (collectively, "consulting agencies") share responsibility for administering the ESA, with FWS responsible for listing terrestrial and freshwater species, 50 C.F.R. § 222.23(a), and NMFS charged with protecting marine and anadromous species, 50 C.F.R. § 227.4. *See also* 50 C.F.R. § 402.01(b).

If a federal agency determines that a proposed action may affect listed species or their critical habitat, the agency must initiate consultation with the appropriate consulting agency, either FWS or NMFS. 18 U.S.C. § 1536(a)(2) (codifying ESA § 7(a)(2)); *see also* 50 C.F.R. § 402.14(a). An action agency may satisfy the requirements of section 7(a)(2) by initiating either "informal" or "formal" consultation with the appropriate consulting agency. Informal consultation is "an optional process that includes all discussions, correspondence, etc., between the Service and the federal agency ... designed to assist the [action agency] in determining whether formal consultation is ... required." 50 C.F.R. § 402.13(a). "If during informal consultation it is determined by the [action agency], with the written concurrence of

AR and NMFS AR are relevant to Plaintiffs' ESA claims.

the [consulting agency], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated and no further action is necessary." *Id.*

However, if informal consultation fails to resolve the question of harm to a listed species, the action agency must engage in formal consultation. Formal consultation procedures require the consulting agency to evaluate the effects of the proposed action on the listed species, and issue a "biological opinion" (BO), which states whether the action is likely to jeopardize the continued existence of the species (hereinafter, "jeopardy finding" or "no jeopardy finding"). 50 C.F.R. § 402.14(h)(3). The issuance of the biological opinion terminates the formal consultation process. 50 C.F.R. § 402.14(*l*)(1).

C. Agency Consultation and Analysis

1. NEPA

a) Dredging Project

In February, 1998, the Corps, jointly with the Port, issued a Draft Environmental Impact Statement/Environmental Impact Report (Draft EIS) for the dredging project. Corps AR 2842–4779. In response to the Draft EIS, Plaintiffs submitted a series of comments asserting that the Corps had failed to evaluate the impact of non-native species entering the San Francisco Bay through ballast water discharges. *Id.* at 8106–24 (March 4, 1998); 8125–8332 (March 30, 1998); 8806–13 (April 23, 1998). The final EIS for the dredging project was published in May, 1998.

The May, 1998 Final EIS recognized that "discharge of ballast water is the primary mechanism by which exotic marine and freshwater organisms are spread around the world today" and that "the establishment of unwanted species . . . can seriously upset the existing ecological balance at the discharge location." *Id.* at 7511. The Final EIS listed several varia-

bles that could affect the likelihood that "any particular discharge of ballast water will lead to the introduction of an invasive species." *Id.* at 7512. Although the Corps identified several relevant variables, it found that there were too many "uncertainties along the potential path of introduction" to quantify the risk of establishment of an invasive species through ballast water discharge. *Id.* at 7514.

Instead, the Corps focused on volume of ballast water discharged, on the theory that a reduction in quantity of ballast water would correlate to a reduced risk of invasive species transported in ballast water. *Id.* at 7513. The Corps concluded that, upon completion of the dredging project in 2010, total ballast water discharged would be less than if no project were undertaken. *Id.* The Corps based this conclusion on the projected increase in the number of post-Panamax vessels using the Port if the project were completed. Because these vessels are wider and more stable, they typically use less ballast water. Consequently, by accommodating these ships in the Port, ballast water discharges would decrease. *Id.*

Based on the reduction in total ballast water discharged, and the inability to quantify the other factors relevant to the invasive species problem, the Corps concluded that "no increased risk of invasive species introduction can be determined to qualify as a significant cumulative impact of the proposed project." *Id.* at 7514. Although it had concluded that there would be no significant impact, the Corps nevertheless identified specific mitigation measures relevant to reducing the risk of invasive species. It recommended that the Port adopt certain of these mitigation measures.

The Corps supplemented the Final EIS with an "Information Report, Corrections, and Updates on the Final EIS/EIR" (In-

formation Report) in March, 1999, and the Port released "Revisions to the Final EIR" (EIR Revisions) in September, 1999. The Information Report and EIR Revisions contained changes in the analysis of the invasive species issue. Specifically, the Final EIS had assumed that the dredging project would result in increased vessel traffic to the Port. A subsequent analysis undertaken in conjunction with the berths project revealed that increased vessel calls were attributable only to the berths project. With only the dredging project, cargo throughput would remain virtually static while ship calls would decrease over time because of the increased use of post-Panamax ships. Consequently, the Corps concluded that the dredging project "would not cause a significant impact from ballast water discharges." Corps AR 9667.

The Corps issued an agency Record of Decision on the dredging project on October 19, 1999.

### b) Berths Project

As lead agency under the California Environmental Quality Act (CEQA), Cal. Pub. Res.Code. § 21000 *et seq.,* the Port issued a detailed EIR for the berths project in April, 1999. This document concluded that the berths and dredging projects, in combination, would likely reduce the risk of introducing invasive species into the Bay.

In support of this conclusion, the EIR reasoned as follows. First, the EIR determined that the berths project alone would increase the volume of ballast water discharged by five percent and, therefore, would have a significant adverse impact on the environment. Corps AR 337a–339, 1323–24. However, the EIR also noted that the combination of all future Port projects would decrease ballast water discharge below the discharge levels if no future projects were implemented and below the levels likely to occur if only the berths project was implemented. Corps AR 477–78, 1326. Although the EIR presumed a cumulative reduction in ballast water discharge, in recognition of the project specific impact, it nevertheless imposed mitigation measures. *Id.* at 337–38a. In particular, the Port relied on Port Ordinance 3516, which required ships visiting the Port to release ballast water in the ocean, thereby reducing the risk that any invasive species may be introduced into the Bay.[3] The combination of the cumulative reduction in ballast water and the likely consequence of Port Ordinance 3516 led the Port to conclude that "the risk of invasive species introduction via ballast water discharges at the Port [will be reduced] to a level far lower than under either existing conditions or the no-project alternative." *Id.* at 1325.

In May, 1999, the Corps completed an Environmental Assessment (EA), rather than a full EIS for the berths project. The Corps incorporated the Port's EIR analysis into its final EA. *Id.* at 1726, 1757. The Corps issued a Permit Evaluation and Decision Document on December 3, 1999, determining that issuance of the requested permit would result in no significant impact. *Id.* at 2237.

### 2. ESA Consultation

### a) FWS Consultation

On January 26, 1998, the Corps initiated formal consultation with FWS pursuant to section 7(a)(2) of the ESA. On June 23, 1998, FWS submitted a draft BO on the effects of the proposed projects on the

---

**3.** Before the Corps completed the EA for the berths project, Port Ordinance 3516 was temporarily and partially superceded by a California statute, 1999 Cal. Stat. 849 (AB 703), prohibiting the near-shore discharge of ballast water by vessels calling on California ports from outside the State's bioregion. *See* Cal. Pub. Res.Code § 71204.

endangered California least tern and the endangered California brown pelican. FWS AR 2383–2403. After receiving comments on the draft BO, and providing responses, FWS issued a final BO covering both the berths and dredging projects.

The FWS BO noted that ballast water discharges are a major vector for introducing non-native species into the Bay–Delta ecosystem. *Id.* at 3031. The biological opinion acknowledged that there "is a probability but not a certainty" that the future introduction of invasive species could affect listed species. *Id.* However, the BO concluded that because ballast water discharges to the San Francisco Bay would decrease as a consequence of anticipated changes in shipping practices and the Port's open-ocean exchange ordinance, the projects were not likely to jeopardize listed species or their habitat. *Id.* at 3031–33.

### b) NMFS Consultation

In March, 1999, the Corps initiated consultation with NMFS to determine the impact of the dredging project on steelhead and winter-run chinook salmon. On August 9, 1999, after reviewing the Corps' Final EIS, NMFS issued a letter of concurrence concluding that the dredging project would not adversely effect listed species or critical habitat.[4] NMFS AR 74–75.

On September 27, 1999, the Corps initiated formal consultation with NMFS for the berths project. Like FWS, NMFS described the adverse effects of exotic species on the Bay–Delta ecosystem, focusing on the impact to salmonid species. *Id.* at 220–21, 225–28. Relying on the anticipated reduction in ballast water discharge, NMFS concluded that the project was not

likely to jeopardize listed species or critical habitat. *Id.* at 229–230.

### STANDARD OF REVIEW

#### A. Summary Judgment

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the nonmoving party, the movant is clearly entitled to prevail as a matter of law. Fed. R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Eisenberg v. Ins. Co. of N. Am.,* 815 F.2d 1285, 1288–89 (9th Cir.1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the Court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Eisenberg,* 815 F.2d at 1289. The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Intel Corp. v. Hartford Accident & Indem. Co.,* 952 F.2d 1551, 1558 (9th Cir.1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the

---

4. As noted above, a letter of concurrence is issued when a consulting agency determines through informal consultation that the federal action is not likely to jeopardize listed species

or their habitat. *See* 50 C.F.R. § 402.13(a). A letter of concurrence represents final agency action under the ESA.

moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The moving party is not required to produce evidence showing the absence of a material fact on such issues, nor must the moving party support its motion with evidence negating the non-moving party's claim. *Id.; see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir.1991), *cert. denied*, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan*, 929 F.2d at 1409. A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a *prima facie* showing in support of its position on that issue. *See UA Local 343 v. Nor–Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir.1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. *See id.; see also Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir.1991). Once it has done so, the non-moving party must set forth specific facts controverting the moving party's *prima facie* case. *See UA Local 343*, 48 F.3d at 1471. The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible." *Id.* This standard does not change

merely because resolution of the relevant issue is "highly fact specific." *See id.*

### B. Administrative Procedure Act

Challenges to final agency actions taken pursuant to NEPA and the ESA are subject to the review provisions of the Administrative Procedure Act (APA). *Southwest Center for Biological Diversity v. Bureau of Reclamation*, 143 F.3d 515, 522 (9th Cir.1998). The Corps' Final EIS with respect to the dredging project, the Corps' EA with respect to the berths project, the biological opinions issued by FWS and NMFS, and NMFS's letter of concurrence addressing the impact of the dredging project under the ESA are all final agency actions subject to review pursuant to the APA. Under the APA, agency decisions may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Ariz. Cattle Growers' Ass'n v. United States Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir.2001).

To determine whether an agency action was arbitrary and capricious, the court must "determine whether the agency articulated a rational connection between the facts found and the choice made." *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1236. As long as the agency decision was based on a consideration of relevant factors and there is no clear error of judgment, the reviewing court may not overturn the agency's action. *Id.* (citing *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991)). In particular, the reviewing court must defer to the agency's decision when the resolution of the dispute involves issues of fact or requires a high level of technical expertise. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Cen. Ariz. Water Conservation Dist. v. EPA*, 990 F.2d 1531, 1539–40 (9th

Cir.1993). Accordingly, the court may set aside only those conclusions that do not have a basis in fact, not those with which it disagrees. *Ariz. Cattle Growers' Ass'n,* 273 F.3d at 1236.

## DISCUSSION

Plaintiffs' first and second claims for relief relate to the Corps' alleged failure to comply with the analysis and public disclosure requirements of NEPA. The third claim for relief alleges that the Corps failed to comply with section 7(a)(1) of the ESA requiring federal agencies to "carry[ ] out programs for the conservation of endangered species and threatened species." The fourth, fifth and sixth claims for relief address the adequacy of the biological opinions and the letter of concurrence issued by FWS and NMFS.

### A. NEPA (First and Second Claims for Relief)

#### 1. Failure to Prepare an EIS for the Berths Project

 Plaintiffs argue that the Corps violated NEPA by producing an EA for the berths project rather than a more comprehensive EIS. When a federal agency action is limited to the grant of a permit, as is the case with the berths project, a decision to grant the permit "will normally require only an EA." 33 C.F.R. § 230.7(a). But NEPA does requires that an EIS be prepared if the subject action "significantly affects the quality of the human environment." 42 U.S.C. § 4332(2)(C). Whether the proposed action requires an EIS is determined by the context and intensity of the impacts of the project. 40 C.F.R. § 1508.27. "Context simply delimits the scope of the agency's action, including the

interests affected. Intensity relates to the degree to which the agency action affects the ... interests identified." *Nat'l Parks and Conservation Ass'n v. Babbitt,* 241 F.3d 722, 731 (9th Cir.2001). The EA ultimately concluded that the project was likely to have no adverse impact from invasive species and, therefore, the context and intensity of the project did not require an EIS. Corps AR 2235–36. Plaintiffs contend that this determination was improper because the Corps failed independently to determine the environmental consequences of the berths project. Plaintiffs contend that the Corps' reliance on the Port's EIR was impermissible under NEPA.[5]

An agency is entitled to utilize environmental information submitted by a permit applicant, and may even allow that applicant to prepare an EA. 40 C.F.R. § 1506.5(a)-(b).[6] However, an agency is also required to "independently evaluate the information submitted and ... be responsible for its accuracy." 40 C.F.R. § 1506.5(a). The intent of this regulation is that "acceptable work not be redone, but that it be verified by the agency." *Id.* Plaintiffs argue that the Corps impermissibly adopted the data, analysis and conclusions in the Port's EIR without any independent evaluation.

Plaintiffs rely on several cases in support of this contention. *See Southern Or. Citizens Against Toxic Sprays, Inc. v. Clark,* 720 F.2d 1475 (9th Cir.1983); *Or. Envtl. Council v. Kunzman,* 714 F.2d 901, 904 (9th Cir.1983); *The Steamboaters v. Fed. Energy Regulatory Comm'n,* 759 F.2d 1382 (9th Cir.1985). These cases are inapposite. In *Clark* and *Kunzman,* the agencies relied on the fact that a specific

---

**5.** As noted above, the Port was required to produce the EIR under CEQA.

**6.** The Corps' regulations, in fact, urge that reference material should be incorporated

into the agency's final environmental report "to the maximum extent practicable." 33 C.F.R. § 230.26(b); 40 C.F.R. § 1502.21.

chemical had been listed under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) to conclude that a site-specific use of that chemical would not have significant adverse effects under NEPA.[7] The court held that such reliance was improper because "[t]he licensing of pesticides containing carbaryl does not 'reflect a conclusion that a pesticide is safe under any conditions ...'" *Kunzman,* 714 F.2d at 905 (citing *Calvert Cliffs' Coordinating Comm. v. Atomic Energy Comm'n,* 449 F.2d 1109, 1123 (D.C.Cir.1971)); *see also Clark,* 720 F.2d at 1480. The investigation required to determine that a chemical should be listed under FIFRA did not address the issues raised by the NEPA claim. Consequently, such reliance was misplaced. In this case, however, the Port's EIR addressed the same issues that faced the Corps when producing its EA. The question raised here is to what extent the Corps was required to duplicate the work already done by the Port to assure that bias and mistake had not affected the Port's conclusions.

■ Plaintiffs argue that there is no evidence in the record that the Corps satisfied its obligation of independent evaluation. However, the Corps concisely summarized the findings of the Port's EIR with respect to invasive species, cited and attached the documents on which it relied, and issued a FONSI explicitly "based on a review of information incorporated in the" EA. Corps AR 1757, 2235–36. Absent some indication that the Corps acted improperly, the Court will presume that the Corps' decision-making process was adequate and that it fulfilled its statutory and regulatory duty of independent evaluation. *Akiak Native Cmty. v. United States Postal Serv.,* 213 F.3d 1140, 1146 (9th Cir.2000) ("agency's decision-making process is ac-

corded a presumption of regularity"). Therefore, the Corps' reliance on the Port's EIR did not violate NEPA.

2. Insufficient Discussion of Invasive Species Problem

■ Plaintiffs also contend that the dredging project EIS and the berths project EA produced by the Corps were inadequate under NEPA. As noted above, the fundamental purpose of NEPA is to provide disclosure of significant environmental risks before a project is undertaken. Consequently, "an EIS is in compliance with NEPA when its form, content and preparation substantially 1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in light of its environmental consequences, and 2) make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of that information." *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir.1974).

Plaintiffs contend that both the dredging project EIS and the berths project EA failed to satisfy this notice function because these documents do not contain sufficient discussions of potential invasive species impacts and causes. Plaintiffs raise three specific areas where they allege that the EIS and EA skirted the vital environmental issues raised by the projects.

First, Plaintiffs contend that the documents contain an insufficient discussion of the potential impacts of invasive species on the San Francisco Bay. Plaintiffs point out that invasive species can lead to multiple, diverse ecological and economic problems. In particular, the transplanting of non-

---

7. In *Steamboaters,* the agency failed to produce an EA at all. In this case, the Corps produced an EA addressing the same issues

the Port had comprehensively assessed in its EIR.

native species creates a significant danger to native species by disrupting the local food chain and altering the physical environment in which local species thrive. Invasive species, therefore, may lead to endangerment or extinction of indigenous species. *See* Plaintiffs' Motion for Summary Judgment at 3–8. Plaintiffs argue that the Corps failed to discuss these potential impacts in its EIS or EA and, therefore, failed to satisfy its obligation to provide adequate information on which to base policy.

Defendants contend that the discussion of potential invasive species impacts was reasonable and sufficient under the circumstances. This is so because the Corps was only required to provide a "full and fair discussion of the significant environmental impacts" of the action. 40 C.F.R. § 1502.1; *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982) (EIS must contain "a reasonably thorough discussion of the significant aspects of the probable environmental consequences"). Both the EIS and the EA concluded that the projects in question would have no significant adverse environmental impact with respect to invasive species. The Corps, therefore, had no obligation to discuss the potential consequences of the introduction of invasive species into the Bay. In other words, Defendants argue that they had no legal obligation to provide a detailed description of impacts that the projects will not have.

If the Corps' determination that the projects are more likely to have a mitigating effect on the risk of introduction of invasive species was correct, it was not obliged to provide a detailed discussion of the environmental consequences of potential invasive species introduction. Consequently, whether the discussion of invasive species impacts was sufficient is dependent on whether the Corps' determination of risk was adequate. Plaintiffs raise two challenges to the Corps' assessment of the

invasive species risk. First, Plaintiffs argue that the Corps failed to consider all of the relevant factors that contribute to the introduction of invasive species. Second, Plaintiffs contend that the Corps' analysis of the one risk factor it did consider—ballast water discharge volume—was flawed.

■ Plaintiffs argue that in order properly to assess the invasive species risk, the Corps was required to consider the numerous factors that contribute to that risk, including the source of the ballast water, the time in transit, and the location of the discharge of ballast water. In fact, in both the EIS and the EA, the Corps considered all of the risk factors identified by Plaintiffs. Corps AR 1325, 7512–14. However, the Corps concluded that it was unable to base its determination on these factors because no methodology existed to quantify these various risks.

> No established methodology has been developed to quantify the risk that ballast water discharges will result in introduction of invasive species. Nor is there a generally accepted methodology to predict the potential environmental impact of the introduction of invasive species.

> The likelihood that any particular discharge or volume of discharge of ballast water will lead to the introduction of an invasive species and result in environmental impact depends upon a large number of uncertainties along the path of introduction. Information to satisfy these variables as they relate to the myriad of potential invasive species is either unavailable or incomplete, and the cost and complexity of collecting and analyzing such information would be prohibitive.

*Id.* at 7514.

> Because of the complexity of the issue, there are currently no models in use to

predict which exotic species will become established in a new location.

*Id.* at 1325.

The Corps reasonably concluded that it was unable accurately to quantify the myriad variables that Plaintiffs have identified. Moreover, even assuming that the Corps could accurately quantify these variables, Plaintiffs do not explain how the Corps could translate these variables to meaningful predictions of the projects' environmental impact. Instead of speculating as to what these uncertain impacts might be, the Corps chose a relatively simple model: if the volume of ballast water decreases, the number of invasive species living in that ballast water is likely to decrease, thereby decreasing the possible environmental impact of invasive species. Plaintiffs' suggestions would add complexity to this model without increasing its predictive accuracy. Accordingly, the Corps did not act arbitrarily by relying on the volume of ballast water discharged as the determinative variable in its invasive species analysis.

In order to survive review, however, the ballast water discharge calculations must be founded "in reasoned evaluation of the relevant factors." *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851. In its EA for the berths project, the Corps concluded that the combination of the dredging and berths project would both expand capacity at the Port of Oakland and decrease the total ballast water into the Bay. Corps AR 478. Because the dredging project would increase the percentage of cargo transported by larger, more efficient post-"Panamax" vessels, the number of vessel calls per existing berth is expected to decrease substantially. *Id.* at 9667, 9679. In addition, the newer vessels are wider and more stable and therefore typically carry only

one-fourth of the ballast water required by the older Panamax vessels. *Id.* at 478, 9667.[8] On the balance, the total ballast water discharged by vessels calling on the Port of Oakland is expected to drop from 6.0 million metric tons in 1996 to 3.5 million metric tons in 2010. *Id.* at 478.

Plaintiffs take issue with several assumptions underlying this analysis. Plaintiffs contend that the Corps improperly relied on "personal communications" to estimate the ballast water discharge of post-Panamax vessels. *Id.* at 7513. Plaintiffs cite no authority that only written information may be relied on in an EIS and the Court declines to impose such a requirement. The individuals who provided the oral information, and their respective capacities, were disclosed in the EIS, thereby enabling verification by interested parties. *Id.* at 7516.

In addition, Plaintiffs contend that the Corps used uncertain ballast water volume estimates and arbitrarily based its no significant impact finding on discharge estimates from 2010. Plaintiffs note that, based on the estimates provided by the Port, the project will increase ballast water discharged at the Port in 2003. The discharges under the "with project" scenario are then expected to decrease over time as changes in the fleet mix result in a higher proportion of post-Panamax vessels. Plaintiffs also point out that "equally reasonable" assumptions of discharge volume could lead to an estimated increase in ballast water discharged in 2010.

Plaintiffs concede that the Corps' selection of the year 2010 as a basis for analysis and its ballast water discharge estimates were reasonable assumptions entitled to deference by this Court. Plaintiffs' Reply at 9 n. 9. Plaintiffs' argument is that given

---

8. Because the post-Panamax-class vessel are wider than those in the Panamax class, the ballast in these vessels is primarily used to correct vessel trim and not to provide overall stability. *Id.* at 478.

the numerous non-quantifiable risk factors relevant to the invasive species question and the uncertain nature of the Corps' assumptions, the Corps was obliged to recognize this uncertainty and provide a thorough discussion of potential impacts in the event that unanalyzed risks proved relevant or uncertain assumptions proved incorrect. In support of this argument, Plaintiffs rely on 40 C.F.R. § 1502.22. That regulation provides guidelines to agencies faced with "incomplete or unavailable information" when "evaluating reasonably foreseeable significant adverse effects on the human environment." *Id.* The regulation defines "reasonably foreseeable impacts" as

> impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture and is within the rule of reason.

40 C.F.R. § 1502.22(b)(1).

In this case, the Corps was not required to describe the potentially severe consequences of invasive species introduction into the Bay because there was no "credible scientific evidence" that such impacts would occur. The information in the record, much of it submitted by Plaintiffs during the comment period, indicated that there was no established methodology for foreseeing the arrival, survival and impacts of an invasive species. "Predictions of what species will invade, and where and when invasions will occur, remain one of the more elusive aspects of biological invasion science." Corps AR 8300 (The National Sea Grant College Program, *The Role of Shipping in the Introduction of Nonindigenous Aquatic Organisms to the Coastal Waters of the United States (other than the Great Lakes) and an Analysis of Control Options* (the Shipping Study), at xxiii). "A more basic problem is that there are generally far too few data to demon-

strate how introduced species affect native species. Furthermore, we have no idea under what circumstances such effects ripple or cascade through the food web of the receiving community." *Id.* at 9278 n. 24 (Townsend, *Invasion Biology and Ecological Impacts of Brown Trout, Salmo trutta in New Zealand,* Biological Conservation, vol. 78 at 13). In this context, Plaintiffs' proposed discussion of risk factors and potential impacts would have been "based on pure conjecture." 40 C.F.R. § 1502.22(b)(1). The disclosure purpose of NEPA does not require such an exercise.

In sum, the Corps' reliance on ballast water discharge estimates to assess the impact of invasive species was not arbitrary; it was the only quantifiable measurement that correlated with the likelihood of introduction of non-native species. Although other risk factors were considered by the Corps, it reasonably determined that—in the absence of a sound scientific methodology for translating these factors into impact predictions—detailed analysis of these factors would not aid in its assessment of reasonably foreseeable impacts. Because this methodology was not arbitrary, and the Corps used reasonable assumptions to implement this methodology, its conclusion that the projects would decrease the risk of invasive species impacts was likewise not arbitrary. Furthermore, because this conclusion was well-supported, the Corps did not err in failing to provide a detailed description of possible impacts if invasive species were to be established in the Bay.

### 3. Cumulative Impacts Not Examined

■ In addition to project-specific impacts, an EIS (or an EA) must consider the cumulative effects of a project. 40 C.F.R. § 1508.8. A "cumulative impact" is defined as

the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

*Id.* § 1508.7. When two related projects are under consideration by an agency, and environmental documentation is being completed for each, a cumulative impact analysis "need be done in only one of the studies." *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1152 (9th Cir. 1998). In this case, it is the berths project EA that contains the more extensive cumulative impacts analysis. Corps AR 477–79, 1326.

The Port's EIR, incorporated into the Corps' EA, concluded that "the cumulative ballast water discharge volume under all probable future Port projects would be about one-half what it would be if the [berths] project alone were constructed and about 14% less than it would be if no probable future port projects were constructed." *Id.* at 1326.

■ Plaintiffs raise three issues with respect to the cumulative impacts analysis in the EA. First, they argue that the Corps failed to consider near-term cumulative impacts. Plaintiffs argue that the Corps was obliged to assess the cumulative impact of the projects for every year through 2010. Based on the Port's estimated ballast water volume numbers that show an increased discharge in 2003, Plaintiffs argue that the Corps should have assessed whether the short-term cumula-

tive impacts may outweigh the long-term cumulative benefits. Plaintiffs never raised this concern during the lengthy comment process preceding issuance of the environmental documents. Therefore, the Court declines to address it here. *See Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 553–54, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (plaintiff cannot seek to have an agency determination vacated on grounds that it failed to raise before the agency).[9]

■ Second, Plaintiffs argue that the cumulative volume discharge estimates in the Port's EIR are incorrect. Plaintiffs argue that the 2010 discharges under the "without project" alternative are actually 3,481,000 metric tons, slightly less than those under the "with project" scenario. However, Plaintiffs arrive at this figure by selecting the "with project" calculation from the berths project cumulative impact analysis, Corps AR 477–78, and the "without project" calculation from the revisions to the dredging project's project specific analysis. *Id.* at 9679. These documents use different methodologies to calculate discharge volumes. *See id.* at 9667–68. Accordingly, Plaintiffs' contention that the "with project" alternative would result in a higher 2010 discharge volume than the "without project" scenario is flawed.

In fact, the Final Berths Project EIR does compare projected "with project" and "without project" discharges in 2003 and 2010. In 2003, estimated discharges under the "with project" alternative would be 4.9 million gallons, roughly twenty percent higher than the "without project" scenario. *Id.* at 478. The discharges under the "with project" scenario are predicted to

---

**9.** Moreover, the Corps chose to assess the impacts of the projects in 2010 because that is the year that the projects are targeted for completion. This was a reasonable methodological choice made by the Corps entitled to

deference by this Court. *See Pacific Coast Fed'n v. NMFS,* 265 F.3d 1028, 1037 (9th Cir.2001) (NMFS required to assess affects of project on listed species "immediately after the project action is completed").

decrease over time as changes in the fleet mix result in a higher proportion of post-Panamax vessels. By 2010, the total ballast water discharge is approximately ten percent lower under the "with project" alternative. *See id.* at 477–78 tbl. 5–14.

 Last, Plaintiffs contend that the EA impermissibly failed to consider reasonably foreseeable projects by agencies other than the Port when assessing the cumulative impact of the dredging and berths project. However, the Corps concluded that the dredging and berths projects will result in a mitigating impact on the risk of introduction of non-native species by reducing the overall volume of ballast water discharged. Once this conclusion was reached, there was no reason to examine projects by other agencies that might have negative impacts on the introduction of invasive species. In other words, there is no logical reason to modify or eliminate a beneficial project because other projects by other agencies may have negative effects. In fact, in support of its argument, Plaintiffs rely on their contention that ballast water discharges will actually increase in comparison to the "no project" option. As already discussed, the Corps' conclusion that ballast water discharges will decrease was a reasonable conclusion derived from the available facts and reasonable assumptions. Furthermore, the Corps' reliance on ballast water volume estimates as a proxy for invasive species risks was not arbitrary. Consequently, the Corps' cumulative impacts analysis was sufficient to reach the conclusion that the projects will have a net mitigating impact on the risk of introduction of invasive species.

### 4. No Meaningful Mitigation Measures Analyzed

 An EIS or an EA promulgated under NEPA must contain "a reasonably complete discussion of possible mitigation measures." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 352, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). "There is a fundamental distinction, however, between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other." *Id.* "NEPA does not require a fully developed plan that will mitigate all environmental harm before an agency can act; NEPA requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated." *Laguna Greenbelt v. United States Dept. of Transp.,* 42 F.3d 517, 528 (9th Cir.1994) (citing *Robertson,* 490 U.S. at 352, 109 S.Ct. 1835).

In the present case, the Corps concluded that the dredging project would decrease the amount of ballast water discharged in the Bay. The dredging project EIS, therefore, contained no mandatory mitigation measures, but recommended that certain mitigation be undertaken. The berths project EA, on the other hand, found that the berths project alone would lead to an increase in ballast water discharge. The EA further found that the berths project, in combination will all likely projects, would result in a decrease in the volume of ballast water discharged. Nevertheless, because of the project-specific impact, the EA recommended several mitigation measures. Corps AR 1328–32.

The most important of these measures was the adoption of Port Ordinance 3516, mandating that ships using the Port's facilities flush the ballast water from distant ports in the open ocean prior to entering the Port. The ships then enter the Port carrying seawater that is likely to be free of invasive species. This process is known

as "open ocean exchange." The Corps concluded that open ocean exchange of ballast water "is estimated to be between 85–95 percent effective at eliminating the risk of ballast water-borne invasive species introduction." *Id.* at 1329. Based on this 85–95 percent "kill rate," the Corps concluded that the open ocean exchange ordinance would effectively mitigate the environmental impact of the berths project.

■ Plaintiffs contend that the Corps improperly relied on the Port's open ocean exchange ordinance as effective mitigation of invasive species impacts and failed adequately to discuss alternative mitigation measures. First, Plaintiffs contend that the Corps should not have relied on the open ocean exchange ordinance at all because it was superceded by California law. Prior to publication of the final EA, the State passed AB 703, which imposed mandatory open ocean exchange for all ships coming into the Port. Plaintiffs argue that the "no project" baseline against which mitigation alternatives were measured should have included the effects of AB 703. Plaintiffs argue that because Port Ordinance 3516 offered no increased mitigation over that provided by AB 703, the open ocean exchange ordinance cannot qualify as effective mitigation.

However, the State statute identified by Plaintiffs contains a sunset provision. Cal. Pub. Res.Code § 71271 ("This division shall remain in effect only until January 1, 2004, and as of that date is repealed, unless a later enacted statute, that is enacted before January 1, 2004 deletes or extends that date."). The Port's ballast water mitigation ordinance, on the other hand, will continue beyond this date. The fact that the Port's ordinance overlaps with general California law in the near term—for the next year and a half—does not render it meaningless or redundant. As Plaintiffs note, the alleged project impacts will be in the future "when predicted changes in the

fleet numbers and mix will manifest themselves." Pl. Reply Brief at 16 n. 12. The Port Ordinance is the only measure that will be in effect after January 1, 2004 to assure that open ocean exchange of ballast water will continue to take place. Consequently, the passage of AB 703 did not render the Corps' proposed mitigation measure redundant or ineffective.

■ Plaintiffs also argue that the Corps' conclusion with respect to the efficacy of open ocean exchange is not supported by the evidence in the record. As noted above, the Corps properly relied on the Port's EIR for its conclusion with respect to the effectiveness of potential mitigation measures. The Port, in turn, relied on both a Technical Memorandum and the Coast Guard's Notice of Proposed Rulemaking for regulations implementing the National Invasive Species Act of 1996 to conclude that the Port's open ocean exchange ordinance would be between eighty-five and ninety-five percent effective in reducing the risk of invasive species introduction. Corps AR 1329–31 (citing 63 Fed.Reg. 17782–92 and Technical Memorandum (Corps AR 1073)). The cited documents provide sufficient support for the Corps' conclusion that open ocean exchange would effectively mitigate the impacts of the berths project. In fact, in their comments to the Corps in 1998, Plaintiffs specifically noted, "The one measure to prevent introduction of non-native species which is immediately available and has proven effective is the offshore exchange of ballast water by ships before entering port." Corps AR 8149.

Based on credible data that open ocean exchange would mitigate project effects, the Corps adopted this suggestion. Plaintiffs, in effect, ask the Court to re-assess this evidence in light of a draft EPA report published two years after the EA was finalized. *See* Declaration of Deborah Si-

vas (Sivas Dec.), Ex. D (*Aquatic Nuisance Species in Ballast Water Discharges: Issues and Options,* (Draft Report of the Environmental Protection Agency, ·Sept. 10, 2001)). However, the Corps' conclusion as to the effect of the open ocean exchange ordinance was fully consistent with the scientific evidence available at the time. As such, it is entitled to deference from this Court.

Plaintiffs also argue that the Corps failed adequately to discuss alternative mitigation measures. In particular, Plaintiffs contend that the Corps failed to consider on-shore treatment techniques for ballast water, including entering into an arrangement with the East Bay Municipal Utility District (EBMUD) to test the treatment of ballast water at the local treatment plant.

In fact, treatment techniques were discussed in the dredging project EIS, *see* Corps AR 7515, and in the berths project final EIR. *Id.* at 1332. The efficacy and viability of treatment techniques were extensively discussed in the supporting documents accompanying the final EIR. *Id.* at 1084–87. For example, a study completed for the California Association of Port Authorities evaluated dozens of treatment technologies and concluded, "At this time, all options for treating ballast water are experimental and the basis for rejecting options is often complex." *Id.* at 9432. Another study of potential treatment options concluded, "Many of these techniques are experimental, under development, or are currently very expensive to implement onboard ship or ashore." *Id.* at 9622.

In particular, both the dredging project EIS and the berths project EA discussed the potential use of the local treatment facilities of the EBMUD for the treatment of ballast water. *See id.* at 1332, 7515. The EA states, "The Port committed to exploring with EBMUD the possibility of requiring vessel operators to discharge their ballast water into the EBMUD system for treatment. EBMUD has responded that it is not currently interested in pursuing such an option because its system is not designed to treat, and would be damaged by, saline water." *Id.* at 1332.

In support of their argument that the discussion with respect to EBMUD is insufficient, Plaintiffs rely on the declarations of Linda Sheehan and Jonathan Kaplan. Both Sheehan and Kaplan declare that they have spoken to EBMUD and learned that EBMUD believes that "its system could be effective in treating ballast water." Kaplan Dec. ¶ 6; Sheehan Dec. ¶ 9. The Court will· not rely on the hearsay contained in these declarations because they were not before the administrative agencies at the time the decisions in question were made. *See Friends of the Earth ·v. Hintz,* 800 F.2d ·822, 829 (9th Cir.1986) (judicial review should be based on "administrative record already in existence, not some new record made initially in the reviewing court"). Consequently, the Corps' conclusion that EBMUD would not offer a viable alternative for mitigation of invasive species impacts was reasonably based on the available evidence in the record and the Court will defer ·to that conclusion here.

As importantly, the administrative record contains substantial evidence that open ocean exchange was considered to be the most effective means to reduce the risk of invasive species impacts. The Corps, therefore, reasonably relied on open ocean exchange and rejected other mitigation techniques as unnecessary and infeasible. *See id.* at 1090–91, 1098–99. The Corps' discussion of these alternative mitigation measures was sufficient to support this conclusion.

In sum, the Corps properly treated Port Ordinance 3516 as a mitigation measure because it provides mandatory ocean ex-

change of ballast water after AB 703 sunsets on January 1, 2004. Moreover, the Corps' conclusion that open ocean exchange of ballast water would adequately mitigate the negative impacts of the berths project was based on substantial scientific evidence. Finally, the Corps adequately identified and discussed additional mitigation measures, including use of EBMUD facilities for treatment of ballast water, and concluded that these additional measures were neither feasible nor necessary in light of the adequate mitigation provided by Port Ordinance 3516. None of the Corps' conclusions with respect to mitigation were arbitrary.

### B. ESA § 7(a)(2) (Fourth, Fifth and Sixth Claims for Relief)

Plaintiffs contend that neither FWS nor NMFS satisfied the substantive requirements of § 7(a)(2) of the ESA. Specifically, Plaintiffs challenge the agencies' assessment of the projects' effects on the distribution of invasive species in the Bay–Delta ecosystem, arguing that the agencies failed adequately to evaluate the impact that the projects would have on the spread of introduced species through ballast water discharges and hull fouling.

#### 1. Scope of Action Area

First, Plaintiffs argue that the agencies improperly limited the scope of their biological opinions to the immediate vicinity of the proposed projects. Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), requires the consulting agency to assess the biological impact of the proposed action on "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02(d) (defining "action area"). Because invasive species can reproduce and spread to the limit of their ecological tolerances, Plaintiffs argue that the proposed actions could indirectly affect listed species found throughout the Bay–Delta ecosystem. Thus, Plaintiffs contend that FWS and NMFS should have evaluated the indirect effects of the projects on each listed species found in the San Francisco Bay estuary. Plaintiffs specifically object to FWS's focus on two endangered species that were identified in biological surveys conducted in the project area from January, 1997 through July, 1997: the California lease tern and the California brown pelican. *See* FWS AR 3025–32.

▮ FWS's focus on the least tern and brown pelican was not arbitrary and capricious. Because these species were found in close proximity to the project area, they are more likely to be affected by the construction and long-term operation of the projects than other listed species in the Bay–Delta ecosystem. This approach is consistent with the ESA's focus on harm to individual listed species and their habitat rather than on the health of ecosystems as a whole. *See* 16 U.S.C. § 1536(b)(4)(C); *see also* 50 C.F.R. § 402.14(g)(1) (listing "onsite inspection" as a method for gathering "relevant information" during the formal consultation process).

It is true that neither FWS nor NMFS separately assessed the impact that invasive organisms might have on each listed species found in the Bay–Delta ecosystem. The agencies' approach reflects the difficulty inherent in predicting the introduction, dispersal, establishment, and ecological impact of invasive species. *See* FWS AR 3032 (FWS Formal Consultation Letter); NMFS AR 226 (NMFS Biological Opinion). Plaintiffs' proposed methodology would require the agencies to assess the indirect effects that changed shipping patterns at the Port of Oakland would have on all listed species in the Bay–Delta ecosystem, or potentially, the West Coast of the United States. Such an analysis would necessarily require a degree of spec-

ulation not contemplated by § 7 of the ESA, which focuses on actions that are "likely to jeopardize" the continued existence of listed species. 16 U.S.C. § 1536(a)(2); *see* 40 C.F.R. § 402.14(h)(3). Neither FWS nor NMFS acted arbitrarily by declining to issue a jeopardy biological opinion based on these speculative effects.

### 2. Relevant Information

■ Next, Plaintiffs reprise their contention that the agencies ignored factors relevant to the introduction of invasive species. The ESA requires the consulting agencies to "review all relevant information provided by the federal agency or otherwise available." 50 C.F.R. § 402.14(g)(1). Plaintiffs argue that FWS and NMFS arbitrarily based their invasive species analyses on the volume of ballast water discharged without considering other factors that may effect the projects' impact on listed species, including the ballast water's time in transit, the location of its discharge, and the risks associated with hull fouling and other non-ballast-tank-related effects.

The record shows that the consulting agencies investigated a range of factors that affect the transport, introduction, and establishment of invasive species. *See* FWS AR 3031; NMFS AR 225–28; Corps AR 1045–1102, 545–901, 8241. Nonetheless, because the "no jeopardy" findings of both agencies relied primarily on the Corps' predicted reduction in ballast water volume, Plaintiffs are correct to suggest that other factors were minimized in the agencies' analyses.

However, Plaintiffs must also show that the agencies' decision to focus on the ballast water volume was arbitrary and capricious. Like the Corps, FWS and NMFS reasonably relied on ballast water volume to quantify the highly uncertain effects that changes in shipping patterns would have on the Bay–Delta ecosystem. *See*

*supra* at 1014–15. Accordingly, neither FWS nor NMFS acted arbitrarily by relying on the volume of ballast water discharge as the determinative variable in their invasive species analyses.

### 3. Ballast Water Projections

■ The consulting agencies reasonably relied on projected ballast water discharges to support their "no jeopardy" findings. However, in order for that "no jeopardy" finding to survive review, the ballast water discharge calculations must be founded in "reasoned evaluation of the relevant factors." *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851. In its berths project EA, the Corps, considering the combined effects of the berths and dredging projects, concluded that although the projects would expand capacity at the Port of Oakland, total ballast water discharge would decrease from 6.0 million tons in 1996 to 3.5 million metric tons in 2010. Corps AR 478; *see also supra* at 1015.

Plaintiffs contend that comparing the 2010 "with project" projections with the 1996 data does not provide a rational basis for determining the "effects of the action" under the ESA. *See* 50 C.F.R. § 402.02(d). Plaintiffs argue that rather than comparing current discharges with post-project ballast water volumes, the consulting agencies should have compared future discharges under "with project" and "without project" scenarios. In other words, Plaintiffs contend that the proper comparison is between expected ballast water discharges after project completion and expected ballast water discharges if the projects were not undertaken at all.

In evaluating the effects of the federal action, the consulting agency must consider the "past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal

projects in the action area that have already undergone ... Section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02(d) (defining "effects of the action"); *see also Kandra v. United States,* 145 F.Supp.2d 1192, 1207–08 (D.Or.2001) (citing *Defenders of Wildlife v. Babbitt,* 130 F.Supp.2d 121, 127–28 (D.D.C.2001)). The consulting agency then determines the effects of the action with reference to this "environmental baseline." 50 C.F.R. 402.02(d); *Kandra,* 145 F.Supp.2d at 1208. In the present case, the "without project" scenario estimates the anticipated impacts of human activities not associated with the projects and therefore establishes the environmental baseline against which the projects must be evaluated. Thus, a comparison of the estimated "with project" and "without project" discharges is relevant to assessing the effects of the action.

As previously discussed, the Final Berths Project EIR does in fact compare projected "with project" and "without project" discharges in 2003 and 2010.[10] However, Plaintiffs observe that this comparison reflects less favorably on the "with project" scenario than the comparison with the 1996 data. The Corps' projections show that "with project" ballast water discharges would temporarily increase relative to the "without project" alternative. *See* Corps AR 478. After this temporary increase, the total ballast water discharge is predicted to be approximately ten percent lower under the "with project" alternative. *See id.*[11]

These figures reflect the total volume discharged and therefore do not account for the mitigating effects of the open-ocean

exchange ordinance, which is intended to reduce significantly discharges to the Bay–Delta ecosystem. The parties dispute the relevance of this mitigation measure to the consulting agencies' no jeopardy conclusion. Defendants contend that their assessment of the effects of the action on listed species must include the projected benefits of the Port's mitigation measure. The mitigation measure to which Defendants refer, Port Ordinance 3516, has been partially and temporarily superceded by the passage of AB 703. However, as noted above, AB 703 will expire on January 1, 2004. *See supra* at 1019. Thus, while the agencies are required to consider the effects of AB 703 in assessing impacts through 2003, the ESA does not require them to speculate as to what actions the California legislature will take when the statute expires. *See* 50 C.F.R. § 402.02(d) (directing consulting agencies to include the impact of "contemporaneous" State actions in the environmental baseline). At a minimum, FWS and NMFS could reasonably rely on Port Ordinance 3516 as insurance against the possibility that the State ballast water management program will not be renewed in 2004.

Even if the effects of AB 703 are considered as part of the environmental baseline, the ultimate inquiry under the ESA is whether the proposed action is "likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(h)(3); *see also* 16 U.S.C. § 1536(a)(2). Unlike NEPA, the ESA does not explicitly require a consulting agency to consider a "no action" alternative when issuing a bio-

---

10. *See supra* at 1017–18. The consulting agencies properly considered the Final EIR in evaluating the effects of the action. *See* 50 C.F.R. § 402.14(g)(1). The EIR is incorporated by reference into the biological opinions.

11. As discussed *supra* at 1017, Plaintiffs' contention that the "with project" scenario would result in a higher 2010 discharge volume than the "without project" alternative lacks merit.

logical · opinion. *Compare* 40 C.F.R. § 1502.14(d) (requiring EIS prepared under NEPA to evaluate "no action" alternative) *with* 16 U.S.C. § 1536(a)(2) (requiring finding under ESA that federal action "is not likely to jeopardize" listed species). Based on their comparison of 1996 and 2010 ballast water discharges, the agencies reasonably concluded that ballast water discharges would decline over time. Because it was reasonable to emphasize ballast water volume over other less quantifiable factors, it was also reasonable to conclude that decreases in the volume of ballast water discharged would decrease the likelihood of jeopardy to a listed species. Regardless of whether this decrease occurs because of the Port's mitigation measures, a State statute, or changes in fleet composition, the effects on listed species remain the same. Furthermore, even when compared with the "without project" alternative, the projects are predicted to result in a long-term decrease in ballast water discharge. Therefore, FWS and NMFS reasonably concluded that the projects are not likely to jeopardize listed species.

### 4. NMFS's Berths Project Biological Opinion

Plaintiffs also separately contest the adequacy of NMFS's finding that the berth projects would not jeopardize listed species.

#### a) Independent Evaluation of Berths Project

■■■ First, Plaintiffs appear to claim that because the berth project, evaluated independently, would increase ballast water discharges, NMFS acted arbitrary in issuing a "no jeopardy" finding. Plaintiffs' contention lacks merit. In fulfilling its interagency consultation obligations under § 7 of the ESA, the consulting agency must consider the "entire agency action." *Conner v. Burford,* 848

F.2d 1441, 1453 (9th Cir.1988). This includes the effects of the federal action together with the ecological impact of "interrelated and interdependent" actions. 50 C.F.R. § 402.02(d); *see also id.* at 1456. In the present case, the berth and dredging projects are closely related elements of the Port of Oakland's modernization program. Accordingly, NMFS's berths project biological opinion did not violate the ESA by considering the ecological effects of the dredging project along with those of the berths project itself.

#### b) Adequacy of Mitigation Measures

■■■ Next, Plaintiffs contend that the consulting agencies failed adequately to analyze the efficacy of open-ocean exchange measures in preventing impacts to listed species. Plaintiffs note that open-ocean exchange is not completely effective in removing non-native species from ballast water tanks. In addition, they observe that compliance with the ordinance is likely to be imperfect. Plaintiffs also observe that neither the port ordinance nor the State statute requires compliance if doing so would jeopardize the safety of the vessel, its crew, or its passengers. *See* Cal. Pub. Res.Code § 71203.

Plaintiffs contend that NMFS acted arbitrarily by adopting the Port of Oakland's view that open-ocean exchange effectively mitigates the adverse effects of invasive species. They note several instances where NMFS considered a "zero discharge standard" for ballast water, before rejecting such options in its final biological opinion. *See, e.g.,* NMFS AR 125, 156–57. In addition, the record shows that NMFS received comments from Plaintiffs and other members of the public encouraging it to consider alternative mitigation measures, including on-shore ballast water treatment. *See, e.g., id.* at 158, 175, 183–84.

In its biological opinion, NMFS explicitly recognized the concerns that Plaintiffs have raised in this action and concluded that the open-ocean exchange is not "100% effective." *Id.* at 227. However, NMFS concluded that "ballast water exchange is the only [currently available] management tool to reduce the risk of ballast-mediated invasion." *Id.* The record contains ample evidence to support its conclusion. *See, e.g., id.* at 288 (Gregory M. Ruiz & Jeffery Crooks, *Scope of Work for the Proposed Study on Efficacy of Ballast Water Exchange* 3 (Jan. 3, 2001 draft)) (noting that "[m]id-ocean exchange is currently the only management strategy available for commercial ships to reduce quantities of non-indigenous coastal plankton in ballast water"); *id.* at 121 (Herbert Engineering Corp., *Ballast Water Management for Containerships* 3 (Sept. 7, 1999)) (observing that open-ocean exchange "greatly mitigates the threat of invasions"); *id.* at 154 (Jan. 28, 1999 Letter from Dames & Moore to Jody Zaitlin, Port of Oakland at 3) (concluding that "there is little evidence to support a statement that ... shore-based treatment is a cost effective option").

In summary, the record supports NMFS's conclusion that open-ocean exchange is an appropriate and effective means for reducing the adverse ecological impact of invasive species. In such cases, the Court is not permitted to substitute its judgment for that of the agency. *See Ariz. Cattle Growers' Ass'n,* 273 F.3d at 1236. Therefore, Plaintiffs' contention that NMFS acted arbitrarily in failing to recommend additional mitigation measures to the Corps lacks merit.

Furthermore, Plaintiffs misconstrue NMFS's role in implementing the ESA. First and foremost, the ESA requires the consulting agency to determine whether a federal action is likely to jeopardize the continued existence of an endangered species. *See* 16 U.S.C. § 1536(a)(2). If, as in the present case, the agency issues a no jeopardy finding, the consulting agency's role in crafting mitigation measures is limited to making an advisory recommendation to the action agency. *See* 50 C.F.R. § 402.15(j). Because these recommendations "are not intended to carry any binding legal force," *id.,* the Court must limit its inquiry to determining whether the mitigation measures effectively prevent the project from jeopardizing listed species. *See Southwest Cen. for Biological Diversity v. United States Bureau of Reclamation,* 143 F.3d 515, 523 (9th Cir.1998) (observing that the agency is not "required to pick the best alternative or the one that would most effectively protect [listed species] from jeopardy"). For the reasons stated above, the open-ocean discharge ordinance meets this standard. Accordingly, NMFS did not act arbitrarily by relying on the ordinance to support its no jeopardy finding.

### 5. Rational Connection to Evidence in the Record

Ultimately, the Court must determine whether "the agency articulated a rational connection between the facts found and the choice made." *Pyramid Lake Paiute Tribe of Indians v. United States,* 898 F.2d 1410, 1414 (9th Cir.1990). Although the Court must defer to an agency's expertise, the agency must articulate the basis for its finding in sufficient detail so that the "agency's path may be reasonably discerned." *Mausolf v. Babbitt,* 125 F.3d 661, 670 (8th Cir.1997).

The biological opinions issued by FWS and NMFS easily meet this standard. Faced with great uncertainty regarding the mechanisms of introduction, establishment, and dispersal of invasive species, the agencies reasonably declined to speculate as to what specific effects

changed shipping patterns at the Port of Oakland might have on these processes. Instead, the agencies relied on projected changes in ballast water volume that would result from approval of the berths and dredging projects. Next, the agencies reasonably concluded that ballast water volume would decrease relative to 1996 data. Furthermore, the record shows that long-term ballast water discharges would decrease relative to the "without project" alternative. Because overall volume discharged would decrease and the implementation of open-ocean exchange measures would further decrease the risk to the Bay–Delta ecosystem, the agencies' findings are rationally related to their conclusion that the projects are not likely to jeopardize listed species.

Accordingly, FWS and NMFS did not act arbitrarily in issuing no jeopardy findings pursuant to § 7(a)(2) of the ESA. The Court therefore grants Defendants' motion for summary judgment on Plaintiffs' § 7(a)(2) claims.

C. Section 7(a)(1) (Third Claim for Relief)

■■■ In addition to the interagency consultation requirements, § 7 of the ESA requires that federal agencies "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs in a manner consistent with the conservation of endangered species and threatened species." 16 U.S.C. § 1536(a)(1) (codifying ESA § 7(a)(1)). Plaintiffs argue that the Corps violated § 7(a)(1) of the ESA by failing to develop a program for the conservation of listed species. Specifically, Plaintiffs contend that because the Corps has authority over all dredging programs and port improvements in the Bay and Delta, it must consult with FWS and NMFS to develop a program protecting listed species from ballast water discharges.

In *Pyramid Lake Paiute Tribe of Indians v. United States Dept. of Navy*, the Ninth Circuit observed that federal agencies have "affirmative obligations" to protect listed species under § 7(a)(1). 898 F.2d 1410, 1417 (9th Cir.1990) (citing *Carson–Truckee Water Conservancy Dist. v. Clark*, 741 F.2d 257, 262 n. 5 (9th Cir. 1984)). However, the court also recognized that an expansive interpretation of § 7(a)(1) would "divest an agency of virtually all discretion in deciding how to fulfill its duty to conserve." *Pyramid Lake Paiute Tribe of Indians*, 898 F.2d at 1418. Under *Pyramid Lake*, an agency has broad discretion to carry out its obligations under section 7(a)(1) so long as its actions satisfy the ESA's general prohibition against jeopardizing listed species. *Pyramid Lake*, 898 F.2d at 1418 (dismissing § 7(a)(1) claim where interagency consultation under § 7(a)(2) resulted in a no jeopardy finding).

In this case, FWS and NMFS found that the Corps' projects are not likely to jeopardize listed species. The Corps was entitled to rely on this no jeopardy finding when carrying out its § 7(a)(1) duty to conserve listed species. The Court therefore grants Defendants' motion for summary judgment on Plaintiffs' § 7(a)(1) claim.

D. Motion to Strike and Evidentiary Objections

Title 5 U.S.C. § 706 limits this Court's review to the record on which Defendants based their determinations. Defendants move to strike materials submitted by Plaintiffs that are not contained in that administrative record. Amicus Curiae Port of Oakland joins in Defendants' motion and, additionally, objects to the same submissions as inadmissible under various provisions of the Federal Rules of Evidence. The Court has reviewed these evi-

dentiary objections and has not relied on any inadmissible evidence. To the extent that the Court has relied on evidence objected to by Defendants, such evidence has been found admissible, the objection to that evidence overruled, and the motion to strike denied (Docket ## 45, 61).

### · CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied (Docket # 33). Defendants' cross motion for summary judgment is granted (Docket # 49). Judgment shall enter accordingly with each party bearing its own costs.